**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**JOHN M. MCDEVITT,**

                 **Plaintiff,**

**-vs-**                                **Case No. 6:05-CV-1120-ORL-31KRS**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL SECURITY,**

                 **Defendant.**
_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

      This cause came on for consideration without oral argument on the Complaint

filed by John M. McDevitt, seeking review of the final decision of the Commissioner of

Social Security denying his claim for social security benefits.  Doc. No. 1.  The

Commissioner answered the Complaint and filed a certified copy of the record before the

Social Security Administration (SSA).  Doc. No. 4.  This matter has been referred to me

for issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b) and Middle

District of Florida Local Rule 6.01(c)(21).

## I.    PROCEDURAL  HISTORY.

      In January 2002, McDevitt applied for disability benefits under the Federal Old

Age, Survivors, and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq*.,

and under the Supplemental Security Income for the Aged, Blind, and Disabled Program

(SSI), 42 U.S.C. § 1381, *et seq*. (sometimes collectively referred to herein as the Act).
R. 5, 77-79.  The original OASDI application alleged that McDevitt became disabled on
December 21, 2001, but he later amended the onset date to August 8, 2001.  R. 77, 79.
McDevitt's applications were denied initially and on reconsideration.

McDevitt requested a hearing before an administrative law judge (ALJ).  R. 69.
An ALJ held a hearing on June 2, 2004. McDevitt, represented by an attorney, testified at
the hearing.  R. 37-58.

After considering the testimony and the medical evidence presented, the ALJ
determined that McDevitt was insured under OASDI through December 31, 2003.  R. 23.
The ALJ found that McDevitt had not engaged in substantial gainful activity since August
8, 2001, the alleged onset date of his disability. R. 23.

The ALJ concluded that the medical evidence showed that McDevitt had had
cervical/lumbar surgeries with residual back, neck, and bilateral upper extremity pain, a
substance addiction disorder allegedly in remission, hypertension, and a history of
tuberculosis, which were severe impairments.  These impairments did not meet or equal
any of the impairments listed in the applicable social security regulations (the Listings).[1]
R. 25.

---

[1]      The Code of Federal Regulations "contains a Listing of Impairments
specifying almost every sort of medical problem ('impairment') from which a person can
suffer, sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391
F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

The ALJ found that McDevitt's mental condition, including depressive and anxiety-related disorders, were not severe so long as McDevitt abstained from alcohol abuse. R. 25. In reaching this decision, the ALJ discounted the consulting psychiatrist and reviewing psychologists' conclusions that McDevitt had a moderate limitation in concentration, persistence, and pace because McDevitt admitted at the time of the consulting psychiatrist's examination of him and in medical records that he was drinking ten to twelve ounces of wine per day. The ALJ indicated that later records did not show significant memory or concentration deficits and that McDevitt did not complain of concentration or memory problems during the hearing. Further, the ALJ observed that the record did not indicate that McDevitt had any ongoing mental health treatment, and McDevitt did not take antidepressant medication. R. 26.

The ALJ found that McDevitt could not perform strenuous work due to his back, neck, and upper extremity pain. R. 27. He concluded that McDevitt had the residual functional capacity (RFC) to perform light work,[2] specifically "to frequently lift/carry up to 10 pounds, occasionally lift/carry up to 20 pounds, walk/stand or sit for about six hours of an 8-hour workday, frequently climb ramps/stairs, balance, stoop, kneel, crouch and crawl, and occasionally reach (including overhead reaching) and climb ladders, ropes, or scaffolding." R. 27. The ALJ further found that McDevitt "should avoid concentrated

---

[2] Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

exposure to working in extreme heat or cold, at heights, or around dangerous machinery." *Id.*

The ALJ based this conclusion on the opinion of Dr. Gottlich and McDevitt's activities of daily living.  He gave lesser weight to the opinion of the reviewing physicians and Dr. McLeod, all of whom opined that McDevitt would be limited to sedentary work. R. 27.

In reaching this conclusion, the ALJ found that McDevitt's testimony about the limitations arising from his impairments was not totally credible. R. 26.  He found that McDevitt's failure to address his alcohol abuse played a significant role in his health problems.  He further noted that no medical evidence in the record supported McDevitt's testimony that his right arm was shrinking due to a bulging thoracic disc.  He observed that McDevitt's complaints of walking instability due to side effects from Librium were inconsistent with his report to Dr. Friedenberg that he walked daily and gardened.  R. 26. Finally, he cited McDevitt's activities of daily living as inconsistent with McDevitt's asserted functional limitations.  R. 27.

The ALJ found that, with this RFC, McDevitt could return to his past relevant work as a telemarketer.  He noted that this work, as performed in the national economy, requires mostly sitting with little or no lifting.  R. 27.  The ALJ did not discuss the mental demands of this work.  Based on the conclusion that McDevitt could perform his past relevant work, the ALJ concluded that McDevitt was not disabled.  R. 27-28.

McDevitt requested review of the ALJ's decision. R. 14.  On May 27, 2005, the Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 6-8.

McDevitt timely sought review of this decision by this Court.  Doc. No. 1.

## II.      JURISDICTION.

The ALJ's decision became the final decision of the Commissioner when the

Appeals Council denied McDevitt's request for review.  *See Falge v. Apfel*, 150 F.3d

1320, 1322 (11th Cir. 1998); 20 C.F.R. §§ 404.981, 416.1481.  Therefore, the Court has

jurisdiction pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. §

1383(c)(3).

## III.     STATEMENT OF FACTS.

A.      *McDevitt's Testimony and Written Statements*.

McDevitt was born April 1, 1954.  He completed twelfth grade.  R. 40.  He is 5'10"

tall and weighed 180 pounds at the time of the hearing.  R. 43.

McDevitt previously worked in boat sales until he suffered a ruptured disc in his

neck.  R. 47.  He also worked in sales and marketing, including telemarketing, and at a

sandwich shop.  R. 48.  He could not return to boat sales or the sandwich shop due to

the physical requirements of those jobs.  He was unsure whether he could concentrate

sufficiently to do telemarketing work.  R. 48.  The pain in his right arm would also hinder

his work at a computer.  R. 55.

McDevitt suffered arm and shoulder pain and occasional tightness and pain in his

lower back.  R. 42, 53-54.  A physician told him that he had a bulging or herniated

thoracic disc that was causing the pain.  He also believed that his right arm was

substantially smaller than his left arm due to the disc problem.  R. 42.  His right arm and

right leg would cramp, and his foot would become numb.  R. 53.  He was not seeking

treatment due to lack of funds.  R. 41.  McDevitt had anxiety due to concerns about lack of money.  R. 43.

McDevitt also had stomach pain as a result of problems caused by chemotherapy. R. 40.  In addition, he had a burning pain in his chest.  R. 52.

He took Librium, but this interfered with his ability to concentrate.  R. 41, 128.  The Librium was to ease the withdrawal symptoms from ceasing to drink alcohol.  R. 41.  He also took Motrin, which helped to alleviate his pain.  R. 52.  On a "bad day," McDevitt would lie on a heating pad on the floor to relieve his pain.  R. 54.  He estimated that he had not had a bad day for six weeks to two months before the hearing.  R. 55.

McDevitt might be able to lift a bag of groceries weighing twenty pounds, but he could not carry a vacuum cleaner up the stairs.  R. 49-50.  He could stand and walk about an hour.  He could sit for an hour or two.  R. 49.  He had problems using his right arm to type.  R. 45.  He had trouble climbing stairs because he was unsteady on his feet. R. 51.

During a typical day, McDevitt would vomit when he first awoke.  He would take Benadryl to settle his stomach, but it made him sleepy.  He lived with two roommates who did most of the cleaning.  McDevitt would do some cooking and occasional light housekeeping, but he rested between chores. R. 45-46, 50.  He was able to drive and he walked about a mile for exercise.  R. 46.  He watched television and read the newspaper.  R. 46-47.  He was able to socialize with his friends.  R. 44. He had difficulty sleeping due to cramps in his right arm, among other things.  R. 51.

B.      *Medical Records.*

Medical records from 1989 through 1991 reflect that McDevitt had a cervical

discectomy and a subsequent cervical discectomy with fusion.  R. 254-78.

In May 2001, McDevitt sought treatment at an emergency room for a near

syncopal episode.  R. 219.  He declined to be admitted to the hospital, indicating that he

felt fine.  R. 218.

On August 8, 2001, McDevitt sought treatment at an emergency room due to back

pain after falling.  The records reflect "recent ETOH," which is short-hand for recent

alcohol use.  *See Lamm v. Provident Life & Accident Ins. Co.*, No. Civ. JFM-04-1341,

2004 WL 1778850, at *1 n.4 (D. Md. Aug. 6, 2004).  X-rays showed no shoulder problem

or new injury to McDevitt's back, although there was previously existing compression of

the T8 vertebra.  R. 159-62, 213.  Other records revealed that McDevitt had a previous

discectomy and fusion surgery in his cervical spine and a laminectomy in his lumbar

spine.  R. 164, 166.

William P. McLeod, M.D., examined McDevitt on August 24, 2001.  At that time,

McDevitt continued to work at a sandwich shop.  He complained of neck and mid

scapular pain.  Upon examination, Dr. McLeod observed a spasm in the area of the

cervical spine.  His assessment was cervical sprain and thoracic strain with radiculopathy

into the left arm.  R. 165.

A physical therapy evaluation done later in August revealed some limitation in

range of motion, with good muscle strength except in the cervical spine.  The physical

therapist noted a spasm in the left upper trapezius and paraspinal muscle spasms in the

lower thoracic region.  McDevitt also had paresthesias in his left arm and hand when he awoke, but his reflexes were intact.  He walked with a normal gait, albeit at a decreased pace.  R. 166-67.

An MRI taken on September 5, 2001 revealed moderate degenerative disc disease at C3-C4 with mild annular bulging and bilateral neural foraminal stenosis.  R. 163-64.

McDevitt sought emergency room treatment on September 14, 2001, complaining of rib pain.  R. 214.  He admitted consuming about a pint of alcohol per day.  R. 172.

On September 7, 2001, Malcolm D. Gottlich, M.D., examined McDevitt for complaints of neck and left upper arm pain, left shoulder pain, and left-sided wrist pain.  R. 177.  He did not have problems with his right hand.  R. 177.  Upon examination, Dr. Gottlich noted back tenderness but no spasms.  His upper body motor strength and range of motion were good.  He had some swelling and tenderness near his rib cage.  His assessment was that McDevitt fractured a rib and strained his left shoulder and cervical spine.  Dr. Gottlich prescribed physical therapy and pain medication.  He released McDevitt to light duty work with no lifting with his right arm greater than five pounds, no lifting with his left arm, and no repetitive pushing, pulling, or overhead physical activity.  R. 178-79.

After a follow-up examination on September 21, 2001, R. 175, Dr. Gottlich discontinued McDevitt's physical therapy.  R. 174.  In a note to the chart dated October 5, 2001, Dr. Gottlich indicated that McDevitt reportedly had not participated in all aspects of physical therapy.  R. 174.

Michael Broom, M.D., examined McDevitt on October 24, 2001. McDevitt complained of low back pain radiating into his left leg and foot and neck pain radiating into both shoulders and arms, more on the left than the right.  He was, nevertheless, working at full duty.  He indicated that the pain increased throughout the day and was exacerbated by bending, lifting, standing for a while, and getting in and out of a car or a chair.  R. 188.  He was unable to heel-to-toe walk due to pain.  Upon examination, Dr. Broom noted some bilateral trapezius tenderness and some trigger point tenderness in the intra-scapular area.  Dr. Broom's assessment was cervical and lumbar strains. He recommended physical therapy and a home exercise program.  He did not impose any work related limitations.  R. 188-90.

McDevitt sought emergency room treatment on December 6, 2001, for back pain radiating to his right shoulder and arm.  R. 180-82, 217.  In a follow-up visit to Dr. Broom on December 12, 2001, he reported global type weakness of his upper right arm with numbness below the elbow.  Dr. Broom instructed McDevitt not to work pending further testing.  R. 187.

On February 12, 2001, McDevitt sought treatment at an emergency room due to feeling "woozy" and then falling, with problems with his leg and slurred speech.  R. 220.

On March 28, 2002, McDevitt again went to an emergency room, this time complaining of chest pain and right arm pain.  R. 208, 211.  Records reflect that he had recently been drinking.  R. 210-11.  He left against medical advise (AMA).  R. 210.  He returned to the hospital on March 29, 2002, when he was examined by Sergio Collado, M.D.  At that time, McDevitt reported that he drank frequently.  He also indicated that he

walked between two and five miles a day.  An ECG and other tests were normal.  Dr.

Collado's assessment was atypical back pain with failed back surgery syndrome.  R.

208-09.

Apparently while still in the hospital, McDevitt began having a seizure.  He was

admitted to the intensive care unit.  McDevitt admitted that he drank alcohol frequently

and he had been using morphine, Ativan, Restoril and hydrocodone.  He was started on

medication, including Librium.  R. 206-07.  M. Emdadul Haque, M.D., opined that the

seizure was not related to narcotic withdrawal.  R. 204-05.

While still in the hospital, McDevitt complained of neck pain radiating to his

shoulders and arms with occasional tingling and numbness in his right arm and

weakness in his right hand.  R. 203.

McDevitt had no further seizures and was discharged from the hospital on April 2,

2002.  The discharge summary reflects final diagnoses as follows: atypical chest pain;

alcohol withdrawal; seizures; alcohol dependence; post-laminectomy syndrome; and

laceration of the tongue.  R. 201-02.

Dr. McLeod examined McDevitt again in June 2002.  McDevitt reported that he

had been doing home exercises, but his condition was worse rather than better.  He

occasionally had nausea and vomiting, which Dr. McLeod attributed to McDevitt's

medication.  Upon examination, Dr. McLeod noted moderate paracervical spasms and

restricted range of motion with some numbness and weakness of the right arm.  Dr.

McLeod opined that McDevitt was capable of sedentary work.  R. 222.

On September 25, 2002, William P. Friedenberg, Ph.D., examined McDevitt at the request of the SSA.  McDevitt reported that he had been depressed with anxiety and panic attacks for about two years.  He reported that he prepared his own meals but had someone help with other household chores.  He gardened, swam occasionally, and tried to walk daily for exercise.  He socialized with friends and generally got along adequately with others.  He attended church weekly.  He admitted to abusing alcohol in the past, and that he then drank ten to twelve ounces of wine daily.  R. 225-26.

Dr. Friedenberg observed that McDevitt was oriented, and his affect was irritable. After testing, Dr. Friedenberg observed the McDevitt's memory and concentration were moderately impaired, especially in short-term recall.  His assessment was that McDevitt suffered from a depressive disorder, an adjustment disorder with mixed anxiety and depressed mood, and alcohol abuse.  R. 225-26.

At least by January 2003, McDevitt had active tuberculosis.  R. 325.  In March 2003, he complained of nausea and vomiting.  He admitted having been drinking at least ten ounces of alcohol a day.  R. 313.  An endoscopy revealed esophagitis and severe gastritis with mild duodenitis.  R. 316.

In August 2003, McDevitt was admitted to a hospital for complaints of right-sided weakness and alcohol withdrawal.  R. 279.  David T. Murray, M.D., opined that McDevitt had degenerative joint disease and degenerative disc disease of the cervical and thoracic spine. R. 280;*see also* R. 292-94.  Magarette Damas, M.D., noted upon examination that McDevitt had good motor strength in both upper extremities, with some loss of sensation on the right probably due to old cervical disc disease.  R. 282.  Dennis

Sorresso, M.D., referred McDevitt to therapy based on complaints of weakness of the left arm and leg.  R. 305.

On November 5, 2003, McDevitt sought emergency room treatment for complaints of nausea and right side pain.  He admitted to drinking that day.  He was treated and released.  R. 351.  Later that month, McDevitt again sought emergency room treatment for seizure.  The assessment was seizure, hypokalemia (low blood potassium), hyperglycemia (high blood sugar), and an increase in chronic shoulder pain.  R. 328.

In February 2004, McDevitt was again treated for a seizure.  Records reflect that he was intoxicated.  R. 343.

C.    *Reviewing Professionals.*

In March 2002, Thomas S. Edwards, M.D., an opthalmologist, completed a physical RFC assessment after reviewing McDevitt's medical records.  He opined that McDevitt could lift up to twenty pounds occasionally and ten pounds frequently.  He could sit, stand, or walk about six hours in an eight-hour workday.  He should only occasionally climb ladders, ropes and scaffolds.  He should avoid concentrated exposure to extreme cold and hazards.  R. 192-99.

In October 2002, Nicholas H. Bancks, M.D., a radiologist, completed an physical RFC assessment after reviewing McDevitt's medical records. He opined that McDevitt could lift up to ten pounds occasionally and less than ten pounds frequently.  He could stand or walk at least two hours and sit about six hours in an eight-hour workday.  He could only occasionally climb, balance, stoop, kneel, crouch, or crawl.  He had a limited ability (about 1/3 of the time) to reach overhead.  He should avoid concentrated

exposure to extreme cold, vibration, and hazards.  R.  227-34.

In October 2002, Val J. Bee, Psy.D., prepared mental RFC assessments after reviewing McDevitt's records.  She opined that McDevitt's mental impairments would result in mild restrictions of activities of daily living and social functioning and moderate difficulties in maintaining concentration, persistence, or pace.  R. 249.  She concluded that McDevitt would be moderately limited in the ability to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods.  He would also be moderately limited in the ability to set realistic goals or make plans independently of others.  R. 235-36.  Dr. Bee wrote that McDevitt's "condition may cause diminished concentration and efficiency, but he appears able to meet the mental demands of well structured task activity."  R. 237.

## IV.    STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). In a case seeking disability benefits under OASDI,

the claimant also must show that he or she became disabled before his or her insured

status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1);

*Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that

must be followed in determining whether a claimant is entitled to benefits.  In sum, an

ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?
>
> (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  An affirmative answer to any of the above

questions leads to either the next question, or, on steps three and five, to a finding of

disability.  A negative answer leads to a finding of "not disabled."  *See, e.g., McDaniel v.

Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987) (per curiam).

"The burden is primarily on the claimant to prove that he is disabled, and therefore

entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274,

1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden

temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence

that there is other work available in significant numbers in the national economy that the

claimant has the capacity to perform."  *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d

1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th

Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

## V.     ANALYSIS.

McDevitt asserts that the ALJ erred by concluding that he would not have difficulties in concentration and by failing to determine whether difficulties in concentration would interfere with his ability to perform his past relevant work as a telemarketer. He also asserts that the ALJ failed fully to develop the physical demands of his work as a telemarketer with respect to the amount of time he would be required to reach overhead in performing that work.  These are the only issues I will address.[3]

> A.     *Alcohol Abuse and Its Effect on McDevitt's Ability to Concentrate and Perform Sustained Work Activity.*

McDevitt contends that the ALJ erred in his conclusion that McDevitt would not have limitations on his ability to concentrate and to complete a normal workday and workweek as indicated by Dr. Bee if he stopped consuming alcohol.  In this regard, McDevitt bears the burden of proving that his alcoholism is not a contributing factor material to his disability determination.  *See Doughty*, 245 F.3d at 1280.

McDevitt is correct that the ALJ erred in his conclusion that McDevitt did not complain about problems with concentration at the hearing.  McDevitt testified that Librium, which he used to deal with alcohol withdrawal symptoms, interfered with his ability to concentrate.  R. 41.  This testimony was consistent with reports he made in

---

[3]      The parties were advised that issues not specifically raised would be waived.  Doc. No. 5 at 2.

written statements.  R. 128. He further testified that he was unsure whether he could concentrate sufficiently to do telemarketing work.  R. 48.

McDevitt also correctly asserts that both Dr. Friedenberg, an examining physician, and Dr. Bee, a reviewing physician, opined that he would have moderate limitations in concentration.  Dr. Friedenberg cited three mental diagnoses: depressive disorder not otherwise specified, adjustment disorder with mixed anxiety and depressed mood, and alcohol abuse.  However, there is no indication in Dr. Friedenberg's report as to how the absence of alcohol abuse would change his conclusions, if at all.  Dr. Bee relied upon Dr. Friedenberg's diagnoses.  In her description of McDevitt's mental RFC, she did not attribute his deficits in concentration to his alcohol abuse.  She also did not opine, however, about what changes, if any, McDevitt would have in his functional ability if he stopped consuming alcohol.  *See* R. 237.

The burden of proof rests with McDevitt to present evidence that he would have limitations on his ability to concentrate and performed sustained work activity even if he stopped consuming alcohol.  He does not cite to any treating, examining, or reviewing physician who so opined.  There is ample evidence in the record to support the ALJ's conclusion that McDevitt's mental condition was impaired by his use of alcohol.  Under these circumstances, I recommend that the Court find that McDevitt has not sustained his burden of proving that he would have mental limitations without use of alcohol.

B.      *Mental and Physical Demands of McDevitt's Past Telemarketing Work.*

McDevitt also asserts that the ALJ erred by failing to develop the concentration and overhead reaching requirements of his past relevant work as a telemarketer.  While the burden of proving that he cannot return to his past relevant work rests on McDevitt,

the SSA has the duty to develop the record fully concerning the requirements of past relevant work.  *See Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987).

McDevitt did not challenge the ALJ's conclusion that he did not have any severe mental impairments except as discussed above.  Because I recommend that the Court conclude that the ALJ did not err in finding that the alleged mental functional limitations would not exist absent alcohol abuse, there were no significant mental functional impairments that the ALJ was required to consider with respect to McDevitt's past work. While the better practice would have been to develop the mental demands of McDevitt's past relevant work, failure to do so under the circumstances of this case was harmless error.

McDevitt also contends that the limitation on the ability to reach would limit his ability to work as a telemarketer.  He relies, in part, on his testimony at the hearing that pain in his right arm limited his ability to work, R. 55, but that testimony does not describe pain with reaching overhead.

The Commissioner correctly argues that the requirements of previous work may be drawn from the *Dictionary of Occupational Titles* (DOT), as well as from a claimant's description of the work as he performed it.  *See Davison v. Halter*, 171 F. Supp. 2d 1282, 1284 (S.D. Ala. 2001)(quoting Soc. Sec. Ruling 82-61).  The DOT description of work as a telemarketer is found at 299.357-014. It specifically provides that the job requires reaching occasionally, meaning up to 1/3 of the time.  DICOT 299.357-014 (available at Westlaw.com).  The ALJ found that McDevitt could reach, including reaching overhead, occasionally, which one reviewing physician defined as having the ability to do this task up to 1/3 of the time.  Therefore, substantial evidence supports the ALJ's conclusion that

the limitation to only occasional overhead reaching would not limit McDevitt's ability to return to his previous work as a telemarketer as that work is performed in the national economy.

## VI.    RECOMMENDATION.

For the reasons stated herein, I respectfully recommend that the decision of the Commissioner be **AFFIRMED**.  I further recommend that the Court direct the Clerk of Court to enter judgment consistent with its decision on this Report and Recommendation and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within **ten (10) days** from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully Recommended this 19th day of October, 2006.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record
Unrepresented Parties